Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANDY S., individually and on behalf of A.S. a minor, <br><br>         Plaintiff, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, ENTERPRISE HOLDINGS HEALTH and WELFARE BENEFITS PLAN, ENTERPRISE HOLDINGS VP GLOBAL BENEFITS PLAN ADMINISTRATOR, <br><br>         Defendants. | COMPLAINT <br><br><br> Case No. 2:23-cv-166 |

Plaintiff Andy S., individually and on behalf of A.S. a minor, through his undersigned counsel, complains and alleges against Defendants United Healthcare Insurance Company, United Behavioral Health (collectively "United"), the Enterprise Holdings Health and Welfare Benefits Plan ("the Plan"), and the Enterprise Holdings VP Global Benefits Plan Administrator ("the Plan Admin") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Andy and A.S. are natural persons residing in Arapahoe County, Colorado. Andy is A.S.'s father.

2. United Healthcare Insurance Company is headquartered in Hennepin County, Minnesota and was the insurer and claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case. United Behavioral Health is the mental health arm of United Healthcare Insurance Company.

3. At all relevant times United acted as agent for the Plan and the Plan Admin.

4. The Plan Admin is the designated administrator for the Plan.

5. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Andy was a participant in the Plan and A.S. was a beneficiary of the Plan at all relevant times. Andy and A.S. continue to be participants and beneficiaries of the Plan.

6. A.S. received medical care and treatment at Uinta Academy ("Uinta") from March 9, 2021, to June 1, 2022.[1] Uinta is a licensed treatment facility located in Cache County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. United denied claims for payment of A.S.'s medical expenses in connection with her treatment at Uinta.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

---

[1] For a brief period in June and July of 2021, A.S. had been hospitalized for a suicide attempt and was not receiving care at Uinta.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United has an extensive business presence in Utah and the appeals at issue in this case were processed at United's Salt Lake City facility. In addition, the treatment at issue took place in Utah.

10. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and A.S.'s privacy will be preserved.

11. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Admin pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Admin and its agents to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### A.S.'s Developmental History and Medical Background

12. A.S. began experiencing mental health issues around the time that she was in the fifth grade. These worsened over time, and in July of 2020 she was hospitalized for suicidal

ideation. A.S. remained in the hospital for several days and then began attending an intensive outpatient program and meeting with a therapist.

13. In November of 2020, A.S. threatened to kill herself by jumping from the fourth story hotel room where she was staying. It was also discovered that A.S. had been engaging in self-destructive activities such as cutting herself, sexual acting out (which led to a sexual assault), alcohol consumption, and purging.

14. In February of 2021, A.S. deliberately attempted to induce a severe anaphylactic reaction by ingesting peanut butter (to which she was severely allergic) and she was again hospitalized. A.S.'s therapist recommended immediate placement in a residential treatment program following her discharge from the hospital.

15. Many facilities refused to admit A.S. due to her recent suicide attempts and their inability to guarantee her safety. This was not only due to the intensity of A.S.'s behaviors, but also their inability to guarantee that A.S. would not have access to peanuts. A.S. was then admitted to Uinta.

**Uinta**

16. A.S. was admitted to Uinta on March 9, 2021.

17. In a letter dated March 12, 2021, United denied payment for A.S.'s treatment at Uinta. The letter, attributed to Belinda Johnson, Advocate, gave the following justification for the denial:

> I have reviewed your treatment plan that was submitted by Uinta Academy RTC LLC, and I have determined that coverage is not available under your benefit plan for the requested services of Mental Health Residential Level of Care services.
>
> According to the Enterprise Holdings, Inc. Summary Plan Description, the request for Mental Health Residential services at a facility that does not adhere to evidenced [sic] based clinical guidelines, such as Level of Care Utilization System (LOCUS) and Child and Adolescent Service Intensity Instrument (CASII)

Guidelines, are not a covered benefit. This means your request cannot be approved because it is not a covered benefit. This facility is noted as unavailable for authorizations for the Mental Health Residential Level of Care due to Service Components that Do Not Match Mental Health Residential as outlined in Level of Care Utilization System (LOCUS) and Child and Adolescent Service Intensity Instrument (CASII). Administrative denial as of 03/09/2021 forward.

18. On August 31, 2021, Andy submitted a level one appeal of the denial of payment for A.S.'s treatment at Uinta. Andy wrote that he was entitled to certain protections under ERISA during the review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers, which considered all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

19. Andy asked that the reviewer be knowledgeable concerning generally accepted standards and clinical best practices for residential programs in the State of Utah, and that they have sufficient training and experience with MHPAEA to appropriately respond to the arguments he raised. He also requested to be provided with a physical copy of any and all documentation related to the adverse determinations, including the reviewers' names, credentials, and case notes or reports.

20. Andy wrote that he had been told by a representative from Uinta that United had flagged Uinta for automatic denial. Uinta provided Andy with a notice letter from United dated May 25, 2018, which stated that all future authorization of services at Uinta was suspended due to:

> Uinta Academy does not appear to be providing treatment at the mental health and substance abuse residential level of care in accordance with Optum's Level of Care Guidelines. Optum's Mental Health and Substance Abuse Residential Treatment Level of Care Guidelines require members to be evaluated by a psychiatrist within twenty-four hours of admission and at least weekly psychiatric

consultation thereafter. In addition, Optum requires the provision of active behavioral health treatment of assessment and diagnostic services twenty-four hours a day, seven days a week in the mental health residential level of care. Custodial care does not comply with Optum's Level of Care Guidelines and is not a covered service under our member benefit plans.

Due to lack of appropriate medical oversight for the mental health and substance abuse residential levels of care, Optum is temporarily suspending approval of authorization and claims may be subject to non-payment.

21. Andy pointed out that the decision to flag Uinta for automatic denial was made using the Optum Level of Care Guidelines. However, these particular guidelines were found to violate generally accepted standards of medical practice and were withdrawn by United and replaced with a new set of guidelines called the Child and Adolescent Service Intensity Instrument ("CASII") on January 31, 2020.

22. Andy argued that despite the fact that United no longer utilized the Optum guidelines, Uinta's status as a flagged facility had never been reassessed under the CASII guidelines which had been in effect for some time. He wrote that Uinta complied with all of the requirements present in the CASII guidelines and should not have continued to be flagged for automatic denial.

23. He reminded United that it had a fiduciary duty to act in his best interest, he argued that continuing to classify Uinta as a denied facility when it no longer had any cause to do so was a violation of this fiduciary duty.

24. Andy provided a list of twenty-five inpatient mental health treatment facilities that had similarly been blacklisted by United. He stated that he was aware of no policies or guidelines that discussed United's criteria for flagging a facility for automatic denial in any detail. He wrote that ERISA required transparency in documents concerning plan

operation and asked for a copy of United's procedures concerning flagging facilities for denial.

25. At a minimum, Andy asked United to specifically identify in detail which provisions of the CASII criteria Uinta allegedly did not meet, with specific references to applicable page numbers. He contended that if United was not able to at a minimum do this, then its decision was clearly without merit. He reminded United that it was statutorily obligated to engage in a meaningful dialogue with him during the appeals process.

26. Andy quoted the definition of a residential treatment facility from the summary plan description and argued that Uinta clearly met this definition. In addition, he pointed out that Uinta was duly licensed by the State of Utah as a residential treatment facility and it was fully compliant with all governing state regulations. He also argued that the treatment provided at Uinta was rendered in accordance with the Plan's medical necessity provisions.

27. He argued that United's denial was a violation of MHPAEA. He wrote that MHPAEA compelled insurance plans to ensure that benefits for behavioral health conditions were administered at parity with benefits for medical or surgical services in the same classification.

28. Andy identified skilled nursing, subacute rehabilitation, and inpatient hospice facilities as some of the medical or surgical analogues to the mental health treatment A.S. received.

29. He voiced his doubt that United flagged out-of-network intermediate level medical or surgical facilities for automatic denial in the same way that it had done for A.S.'s residential treatment care. He asked if he was mistaken that United provide him with direct evidence of it doing this.

30. Andy requested that United perform a MHPAEA compliance analysis and asked for physical copies of the results of this analysis.

31. He wrote that A.S. was admitted to Uinta in the first place because few facilities would even accept her given her recent suicide attempt and their inability to guarantee that they could restrict her access to peanuts.

32. In addition, he stated that he had contacted United prior to A.S.'s admission to verify whether benefits were available. He said that the representative warned him that because Uinta was out-of-network, he would have to be aware of things like balance billing and allowed amounts, but at no point during this recorded conversation did the representative inform Andy that United had flagged Uinta for automatic exclusion and no benefits would be paid.[2]

33. Andy included letters of medical necessity with the appeal. Rachael Price, MS, LPC, NCC, wrote in part in a letter dated February 24, 2021:

> It is my clinical opinion that you need a greater level of care and a more intensive level of therapy than I can provide you with my resources as an outpatient therapist. It is my clinical opinion that you need ongoing safety watch and supervision 24 hours a day at this time. I have recommended higher levels of care to your parents as well as connected them with a mental health placement consultant ("educational consultant["]) to find an appropriate placement for 24-hour supervision and treatment. I also understand that there may be waitlist [sic] to get into one of these 24-hour residential programs so am recommending you begin a partial hospitalization program (PHP) in the interim as nothing less than a higher level of care is recommended and appropriate for meeting your needs at this time in my clinical opinion. I am also recommending that your parents provide 24-hour supervision for safety each and every day during the time you attend PHP while awaiting a bed at a residential program.

---

[2] In another call, Andy was told that the employee who provided the incorrect information would receive "coaching." Andy is not aware of any other action to rectify this misinformation that was taken by United.

34. Ous Badwan, Psy.D., MFT, wrote in part in a psychological evaluation dated January 27, 2021:

> [A.S.]'s profile is highly indicative of a tendency toward affective restriction, defensiveness and guardedness. This makes it difficult for her to benefit from therapy due to the level of vulnerability, trust and openness required for the process to work. Her results do signal a need for emotional support given that she appears to be under significant stress which is not tied to situational factors. In other words, her distress levels are consistent and ongoing. Unfortunately, her high levels of distress are coupled with limited internal coping resources. Meaning that [A.S.] does not possess many tools and/or skills for understanding, expressing and managing her emotions. This dynamic led to her suicidal ideation during this past year. For this reason, she should continue to be monitored closely for risk to self.
>
> Further, [A.S.] has very little insight and understanding of her emotional experience. She tends to express her emotional distress through physical symptoms (Somatization). She views herself as struggling physically and is not all that insightful about her challenges. Her tendency is toward somatization (which is a process by which an individual expresses their emotional distress through physical complaints/symptoms)

35. Andy wrote that A.S.'s treatment had been recommended by her treatment team. He expressed concern that United would attempt to supersede the opinions of the individuals who worked with A.S. on a firsthand basis and actively witnessed the deterioration of her condition. Andy argued that A.S. required residential care to manage treatment of her conditions safely and effectively.

36. In the event United upheld the denial of payment for A.S.'s treatment, Andy asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination, (along with their medical and surgical equivalents, whether or not these were used to evaluate the claim), as well as any reports concerning the claim from any physician or other

professional, together with their names, qualifications, and denial rates. (collectively the "Plan Documents")

37. In a letter dated October 1, 2021, United upheld the denial of payment for dates of service between March 9, 2021, and June 28, 2021. The letter stated in pertinent part:

> This facility is noted as unavailable for authorizations for the Mental Health Residential Treatment Center (RTC) due to Service Components that Do Not Match Mental Health RTC as outlined in Level of Care Utilization Service and CASII; Administrative Denial. Consequently, an administrative denial has been issued.

38. In a letter dated October 4, 2021, attributed to Howard Wong, M.D., United also upheld the denial of payment for treatment from July 6, 2021, forward. The letter gave the following justification for the denial:

> You are being treated for problems with your mood, thoughts, and behaviors. Your request was reviewed by a doctor. We have denied the medical services requested, Mental Health Residential Treatment Level of Care as of July 6, 2021. We talked to your provider's designee. We also reviewed your medical records as provided by the facility.
>
> The criteria are not met because:
> -The facility is not available for authorization at the requested level of care.
> -You no longer require treatment in the requested level of care as of July 22, 2021.
>
> In your case: You are cooperative and participating in your treatment. You are medically stable. You are taking your medications and doing better. You are able to learn and use coping skills. You are less depressed and less anxious.
>
> You are keeping yourself safe and not harming yourself or others. You had a more stable mood. You were not acting on every impulse.
>
> Care and Recovery could continue in the Mental Health Partial Hospitalization Program (PHP)setting. Children and adolescents usually live at home during PHP treatment. Please discuss these options with your provider.

39. As a response to Andy's request for documents, United provided copies of internal notes which provided further context for the reviewers' (Dr. Wong included) decisions to deny payment which were not communicated to Andy in United's actual denial letters.

40. For instance, United's internal notes regarding Dr. Wong's denial show that he actually recommended residential treatment from July 6, 2021, to July 21, 2021, but after that he felt that treatment at the partial hospitalization level was warranted because:

> There are no withdrawal symptoms, acute medical issues, unsafe thoughts, or dysregulated behaviors that require treatment in the requested level of care. She denies active suicidal or homicidal thoughts and has no recent, clinically significant self-harming behaviors or aggression. She is cooperative, responsive to staff, medication adherent, and doing better. She is medically stable, with adequate sleep, appetite, and self-care. She is not having medication changes or reporting side effects that require close 24-hour monitoring. She remains reactive but has improved insight and self-regulation of her emotions and behaviors. Her remaining symptoms can be safely treated in a less intensive setting.

41. Both Dr. Wong's recommendation for residential treatment care, as well as his reliance on factors like "active suicidal or homicidal thoughts" and "significant self-harming behaviors" are present in the internal notes, but do not appear have been communicated to Andy in United's official denial correspondence.

42. United's "sanitized" justification for the denial offered in its official correspondence reveals that it was not completely forthright when communicating with Andy. Whether done intentionally or inadvertently, United's actions are antithetical to the full, fair, and thorough review and meaningful dialogue required of it by ERISA.

43. On November 22, 2021, Andy submitted a level two appeal of the denial of payment of A.S.'s treatment at Uinta. Andy continued to assert that A.S.'s treatment was both medically necessary and a covered benefit under the terms of the Plan.

44. He contended that United continued to violate his rights under ERISA and had not provided him with any of the policies or protocols related to Uinta being flagged as an ineligible provider, nor had it addressed his argument that Uinta met all the requirements to be eligible for coverage under the Plan.

45. Because of this, Andy voiced his concern that United had relied on something other than the terms of the Plan or its CASII criteria to deny payment for the treatment at Uinta.

46. He wrote that United had not engaged in a meaningful dialogue with him and had not attempted to respond to his arguments, nor had it addressed his concerns regarding a violation of MHPAEA.

47. He stated that United's denial appeared to be based on internal policies that were at odds with the language in the Plan documents and that the Plan documents should be given priority over contradictory internal policies. He contended that this was another example of a likely MHPAEA violation to the extent that United did not enforce exclusions or limitations for analogous medical and surgical treatment that conflicted with Plan document language.

48. He wrote that by refusing to identify which provision or exact requirements Uinta allegedly failed to meet, United had prevented him from effectively appealing the denial.

49. He again asked for a copy of the Plan Documents, and asked that if United did not possess these materials that it forward his request to the appropriate entity.

50. In a letter dated December 10, 2021, attributed to Svetlana Libus, MD, United upheld the denial of payment for A.S.'s treatment from July 6, 2021, forward. Even though the review had ostensibly been conducted by a different reviewer, the justification for the denial is essentially word-for-word identical to the October 4, 2021, denial letter.

51. In a letter dated December 22, 2021, again attributed to Svetlana Libus, MD, (in spite of ERISA's prohibition about reusing reviewers), United upheld the denial of payment for dates of service between March 9, 2021, and June 28, 2021. The letter stated that coverage was not available solely because, "the requesting facility was not available for authorization."

52. On March 30, 2022, Andy asked that the denial of payment be evaluated by an external review agency. Andy wrote that A.S.'s suicide attempts prior to her admission to Uinta clearly demonstrated that she would be unable to be successfully treated in a partial hospitalization program, which would require her to spend significant amounts of time at home.

53. He wrote that A.S.'s treating clinicians recommended that she receive treatment at the residential level of care. He argued that United's reviewers had never met or interviewed A.S. and appeared to have only performed a shallow assessment of a few medical records to arrive at their decision.

54. Andy voiced his belief that if A.S. had received partial hospitalization care as United had recommended, her safety would have been at extreme risk. However, because of her treatment at Uinta, A.S. was able to make significant progress.

55. Andy pointed out that United appeared never to have evaluated significant portions of A.S.'s medical records. He wrote that while at Uinta, A.S. was placed on arm's length supervision for the first few months of her stay there, meaning there was a staff member able to physically reach her at all times, and she slept in the "safety room" where she could be closely monitored.

56. He wrote that despite these and other precautions, A.S. was still able to carry out acts of self-harm by sneaking in contraband or simply breaking something like a plate and cutting herself with it.

57. Andy stated that in June of 2021, A.S. was hospitalized for a week after she went to a second story landing at the top of a stairway while at Uinta and threatened to jump. A.S. was hospitalized for this period as Uinta staff were concerned that they would not be able to keep her safe even with the safety measures they were taking. Hospital staff recommended that A.S. continue to receive residential treatment care and she was readmitted to Uinta.

58. A.S. had a home visit scheduled around this time, but Uinta staff felt that going home would be an unacceptable risk, and the "home" visit took place in a hotel near the Uinta campus. A.S. was not allowed to have an actual home visit until September of 2021, but even then she didn't spend the night with family and instead went back to Uinta.

59. Andy asked if the professionals at Uinta were concerned about A.S.'s safety to the point she was not allowed to have a traditional home visit like other residents, how United had determined that she could be adequately treated in a partial hospitalization setting.

60. Andy included copies of A.S.'s medical records as well as letters of medical necessity with the appeal. In a letter dated February 23, 2022, Adaleen Krambule, MA, CMHC, NCC, wrote in part:

> [A.S.] has also continued to demonstrate the need for residential treatment. [A.S.] exhibits impulsivity, self-harm, suicidal ideation, Generalized Anxiety Disorder, Major Depressive Disorder, and Borderline Personality Traits. It is my clinical opinion that [A.S.] should absolutely be cared for at a 24-hour residential treatment facility based on my ongoing treatment of this patient. In my clinical opinion, she should complete her treatment in its entirety, or she may risk severe relapse.

61. Andy argued the guidelines used to assess A.S.'s treatment were more restrictive than allowed by generally accepted clinical standards and failed to address the unique needs of children and adolescents.

62. In a letter dated May 9, 2022, external review agency Dane Street upheld the denial of payment. The reviewer wrote in pertinent part:

> Upon review, it does not appear that the medical records establish that the services performed are medically necessary according to the generally excepted [sic] standards of care. It appears that the patient was in a therapeutic boarding school rather than residential treatment. Many of the treatments provided in this program would not be considered evidence-based.
>
> While it does appear that residential treatment was medically necessary, it does not appear that the treatment provided would be consistent with a generally excepted [sic] residential treatment program, that would typically include transition planning that would be considered in daily clinical review. The treatment intensity provided in this facility did not appear to be in line with Child and Adolescent Service Intensity Instrument (CASII) criteria for a residential treatment facility. Therefore, this treatment did not appear to meet the standard of care and was not medically necessary.
>
> The medical records do not establish that the services performed were medically necessary according to generally accepted standards of care.

63. In a letter dated August 30, 2022, Andy made one last attempt to procure the documentation to which he was entitled by making a formal request to both United and the Plan Admin. In particular, Andy asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my daughter, [A.S.], at Uinta Academy Residential Treatment Center, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [A.S.]'s claim;
- A complete copy of both the medical necessity criteria utilized by United Healthcare & United Behavioral Health in determining that [A.S.]'s treatment was not medically necessary and that treatment for her at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and

Addiction Equity Act;

- Complete copies of any and all internal records compiled by United Healthcare, United Behavioral Health, and Enterprise Holdings in connection with [A.S.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [A.S.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and United Healthcare and United Behavioral Health; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

64. The Plan Admin partially complied to this request for documents, and in an email dated September 30, 2022, provided a copy of the summary plan descriptions for 2021 and 2022, a 2021 booklet titled "PLAN DOCUMENT FOR THE ENTERPRISE HOLDINGS HEALTH AND WELFARE BENEFITS PLAN," a partial copy of the Administrative Service Agreement,[3] and some documentation related to the appeals such as a copy of the denial letters, and internal notes.

65. The materials include documentation such as an "Anchor Point Quick Reference Sheet" for the CASII Guidelines, but do not appear to include the guidelines themselves.

66. The letter also included a point-by-point response to the materials Andy requested in the August 30, 2022, letter. Many of the requested items, such as copies of any memoranda or reports, are marked "N/A" while other sections contain contradictory information.

---

[3] The copy of the agreement provided to Andy appears to be missing pages and does not appear to be complete.

67. For instance, in the response to the request for the medical necessity criteria, United states both that, "United Healthcare did not render a medical necessity determination regarding the care of this member" and "United Behavioral Health made the medical necessity determination according to CASII Guidelines."

68. Items such as the requested medical or surgical criteria were not provided[4] as United claimed that, "[t]here is no single set of medical necessity criteria UHC applies to all requests for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, or inpatient hospice treatment."

69. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

70. The denial of benefits for A.S.'s treatment was a breach of contract and caused Andy to incur medical expenses that should have been paid by the Plan in an amount totaling over $320,000.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

71. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

72. United and the Plan failed to provide coverage for A.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for

---

[4] A very brief four page document titled "Skilled Care and Custodial Services" was included.

medically necessary treatment of mental health and substance use disorders.

73. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

74. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the plaintiff's appeals or whether it provided him with the "full and fair review" to which he is entitled. United failed to substantively respond to the issues presented in Andy's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

75. Specifically, despite numerous repeated and explicit requests, United did not explain what particular factors led to Uinta being an excluded facility, did not produce any set of criteria showing why it blacklisted certain facilities, did not clarify if it had reassessed Uinta for eligibility at any point, and did not otherwise indicate why or how it determined that treatment at Uinta was excluded.

76. In fact, although United was aware that it had blacklisted Uinta, it made no attempt to communicate this to Andy until after A.S. had been enrolled in treatment, even though Andy reached out to United prior to A.S.'s admission.

77. United and the agents of the Plan breached their fiduciary duties to A.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to provide to Andy in a timely way information about the blacklisted status of Uinta, produce copies of relevant documents and information to

Andy upon request, and to provide a full and fair review of A.S.'s claims.

78. The actions of United and the Plan in failing to provide coverage for A.S.'s medically necessary treatment are a violation of the terms of the Plan and its facility eligibility criteria.

79. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

80. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

81. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

82. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

83. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on

medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

84. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

85. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

86. United denied Plaintiff's claims on two general grounds: first, that Uinta did not qualify for coverage under the Plan ("facility eligibility") and second, that the treatment for A.S. at Uinta was not medically necessary under the terms of the Plan.

87. As to the facility eligibility issue, Uinta is a licensed treatment facility and provides treatment in a manner that complies with generally accepted standards of medical practice. Uinta also meets the requirements listed in the summary plan description for a residential treatment facility.

88. United's requirements for intensity of service at Uinta was not aligned with generally accepted standards of medical practice. For example, generally accepted standards of medical practice do not require that residential treatment facilities provide that patients be evaluated by a psychiatrist within twenty-four hours of admission, be treated at least

weekly by a psychiatrist, or provide active behavioral health assessment and diagnostic services twenty-four hours a day, seven days a week.

89. United violated MHPAEA because its facility eligibility criteria did not align with generally accepted standards of care or evidence based clinical guidelines and were more stringent and limiting than the facility eligibility criteria United used to evaluate whether coverage existed for comparable levels of medical and surgical treatment such as inpatient skilled nursing, rehabilitation, and hospice treatment.

90. In addition, United's facility eligibility criteria were not imposed equally to network and non-network mental health and substance use disorder providers.

91. To the extent that the facility eligibility criteria were imposed equally to both network and non-network mental health and substance use disorder providers, it resulted in a disparity in the network coverage under the Plan for mental health and substance use disorder benefits and the network coverage for analogous levels of medical and surgical treatment because United's facility eligibility criteria for coverage of inpatient skilled nursing, rehabilitation, and hospice treatment does not violate generally accepted standards of care.

92. To the extent that the facility eligibility criteria imposed by United on non-network mental health and substance use providers was more restrictive than the facility eligibility criteria United imposed on network mental health and substance use providers, United's actions violated generally accepted standards of care and MHPAEA because United does not require network and non-network facilities providing inpatient skilled nursing, rehabilitation, and hospice treatment to satisfy different facility eligibility criteria to obtain coverage under the Plan.

93. United relied on undisclosed requirements outside of those contained in its plan materials to flag Uinta for an automatic denial of benefits but did not inform Andy of this practice when Andy sought preauthorization from United for A.S.'s treatment.

94. United does not exclude from coverage comparable medical and surgical facilities without telling Plan participants and beneficiaries in the way it did for Uinta in this case. As such, United violated MHPAEA.

95. As for the second basis for United's denial of coverage, medical necessity, the criteria used by United to evaluate the coverage for A.S.'s treatment at Uinta are more stringent and restrictive than the medical necessity criteria the Plan applies to analogous levels of medical or surgical benefits such as inpatient skilled nursing, rehabilitation, and hospice treatment.

96. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.S. received.

97. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's reviewer's internal notes such as ". . . no withdrawal symptoms, acute medical issues, unsafe thoughts, or dysregulated behaviors that require treatment in the requested level of care. She denies active suicidal or homicidal thoughts and has no recent, clinically significant self-harming behaviors or aggression. She is cooperative, responsive to staff, medication adherent, and doing better. She is medically stable . . .."

98. United's use of more stringent and restrictive medical necessity criteria is also reflected in its October 4, 2021, denial letter in stating as a justification for lack of medical necessity that "[y]ou are keeping yourself safe and not harming yourself or others."

99. This improper use of acute inpatient criteria to evaluate A.S.'s treatment at Uinta was a nonquantitative treatment limitation that violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

100. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

101. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

102. In addition, the level of care applied by United failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

103. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

104. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

105. Defendants also disregarded Andy's request for United and the Plan to conduct a parity compliance analysis, and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, United and the Plan have not provided Andy with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, United and the Plan have not provided Andy with any information about the results of this analysis.

106. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity and facility eligibility criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

## **THIRD CAUSE OF ACTION**

### **(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))**

107. United, acting as agent for the Plan Admin, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

108. In spite of Andy's requests during the appeal process for United to produce the documents under which the Plan was operated, and him asking United to forward that request to the appropriate entity if United was not acting on behalf of the Plan Admin in this regard, United repeatedly failed to produce to the Plaintiff the documents under

which the Plan was operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

109. After United repeatedly failed to provide these materials, Andy sent one final letter dated August 30, 2022, to both United and the Plan Admin again requesting the documents which he was statutorily entitled to receive upon request.

110. United and the Plan Admin partially complied with Andy's request for documents but did not produce all of the requisite materials such as criteria for skilled nursing care, the CASII criteria, or the criteria used to determine that Uinta was a flagged facility.

111. The failure of the Plan Admin and its agent United, to produce the documents under which the Plan was operated, as requested by the Plaintiff, within 30 days of Andy's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day on the Plan Admin from 30 days from the date of each of these letters to the date of the production of the requested documents.

112. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for A.S.'s medically necessary treatment at Uinta under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's

Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day against the Plan Admin after the first 30 days for each instance of the Plan Admin and its agent United's failure or refusal to fulfill their duties, to provide the Plaintiff with the documents he had requested.

4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 7th day of March, 2022.

By     s/ Brian S. King
             Brian S. King
             Attorney for Plaintiff

County of Plaintiff's Residence:
Arapahoe County, Colorado.